UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
(at Lexington)

| | | |
|---|---|---|
| JAMES B. MCCARTT, | ) | |
| | ) | |
| Plaintiff, | ) | Civil Action No. 5: 14-318-DCR |
| | ) | |
| V. | ) | |
| | ) | |
| KELLOGG USA, INC., et al., | ) | **MEMORANDUM OPINION** |
| | ) | **AND ORDER** |
| Defendants. | ) | |

\*\*\*   \*\*\*   \*\*\*   \*\*\*

This matter is pending for consideration of Defendants Kellogg USA, Inc.'s and Kellogg Sales Company's (jointly, "Kellogg") motion for summary judgment. [Record No. 48] Plaintiff James B. McCartt asserts claims of age-related discrimination and retaliation in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*, and the Kentucky Civil Rights Act ("KCRA"), KRS Chapter 344, *et seq.* [Record No. 1, pp. 3−6] He also alleges that he is owed back pay and overtime under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, and the Kentucky wage statute, KRS § 337.010, *et seq.* [*Id.*, pp. 9−11] In addition, McCartt asserts a public policy claim premised on the alleged ADEA and FLSA violations. [*Id.*, p. 12]

For the reasons outlined below, the Court will grant summary judgment in favor of Kellogg regarding the plaintiff's claims of retaliation (Counts III and IV), violation of the FLSA and Kentucky wage statute (Counts V, VI, and VIII), and public policy violations (Count VII). However, Kellogg's motion will be denied with respect to the remaining ADEA and KCRA claims (Counts I and II).

- 1 -

## I.

As outlined in the opinion addressing the defendants' *in limine* motion [Record No. 69], Kellogg USA, Inc. and Keebler Foods Company ("Keebler") manufacture food products. [Record No. 48-1, p. 5]  McCartt was hired by Keebler in 1979 as a Territory Manager ("TM") for the Lexington, Kentucky area.  [Record No. 53-2, p. 5]  Kellogg acquired Keebler in 2000.  Following that acquisition, McCartt's title was changed to the Retail Sales Representative ("RSR") of District 797, which includes the greater Lexington area. [Record No. 53-2, p. 7] The RSR position was functionally similar to the TM position, except for an emphasis on sales starting in April 2011.  [*Id.*, pp. 7, 10, 15, 19; Record No. 48-6, "Job Profile"]  RSR duties included: merchandising orders, making incremental sales, building displays, and managing merchandisers.  [Record No. 53-2, pp. 8–9]  The plaintiff alleges that he worked 95% of weekends, resulting in a work-week of over sixty hours.  [*Id.*, p. 26]  He further claims that he generally did not take meal or rest breaks.  [Record No. 1, ¶ 68]

RSRs' direct supervisors were District Managers, whose supervisors, in turn, were Senior Retail Managers (or Zone Managers).   [Record No. 53-2, pp. 11–12]   District Managers performed mid-year assessments of the RSRs.   [Record No. 53-2, p. 15] McCartt's mid-year evaluation in 2012 demonstrated that he was using only 68% of his variable labor and that he was $19,000 behind budget.  [*Id.*, p. 18; Record No. 48-11, "Performance Development Plan"]  McCartt achieved only 91.7% of his sales goals in 2012. However, in the final month of 2012, he was the highest-ranked RSR in his district. [Record No. 48-10, "Period 12, 2012 Regional Score Card"]

In early 2013, Kellogg restructured its sales force, combining its "Morning Foods" sales force with its "Snacks" sales force.  [Record No. 48-12, ¶ 4, "Anderson Decl."]  As a result, fewer overall RSR roles were available.  In January, all the Zone Managers convened in Chicago to assess the RSR sales force.  [*Id.*, ¶ 5]  However, they were not told the reasons for the assessment.  [*Id.*]  As part of this process, Zone Managers assessed each RSR in his or her zone according to technical and Kellogg Business Leader Model ("KBLM") competencies, giving each a score of one to five.  [*Id.*]  The Zone Managers were instructed to rely on employee "scorecards," which contained objective figures, as well as their personal experience with the RSRs.  [Record No. 48-14, ¶ 5, "Grzanka Decl."]

Next, the Human Resources ("HR") department created pools of RSRs for comparison purposes.  [Record No. 48-12, ¶ 6]  Essentially, HR compared all Snacks RSRs who had over 50% of their assigned stores within 25 miles of a particular Morning Foods RSR's residence.  [*Id.*]  The RSR with the lowest average score in each pool was displaced. [*Id.*]  Megan Anderson was the HR person responsible for pooling assessments in the Cincinnati Zone, which included McCartt.  [*Id.*, ¶ 8]  Because Grzanka's assessment of McCartt was the lowest in his pool, HR decided to terminate him.  [*Id.*, ¶ 9]

In February 2013, interim District Manager Andrew Hart and Zone Manager Kevin Grzanka met with McCartt to inform him that a rumored "list of targeted employees" did not exist.  [Record No. 53-2, p. 20]  During that time, McCartt's prior District Manager, John Taylor, allegedly informed McCartt of a comment by Grzanka regarding the plaintiff. [Record No. 53-2, p. 23]  The conversation between Grzanka and Taylor purportedly occurred during Taylor's midyear evaluation (summer 2012), after Taylor remarked

positively on McCartt but stated that he could be more "aggressive" about displays.  [Record No. 53-13, pp. 36–37, "Taylor Deposition"]   During his deposition, Taylor alleges that Grzanka responded, "Mr. McCartt is too old and set in his ways to make the changes necessary.  We need to, more or less, move in different directions."  [*Id.*, p. 37]  In his Complaint, the plaintiff alleged that he reported this comment to his superiors prior to his termination.  [Record No. 1, ¶ 34]  However, in his deposition, he denies reporting the comment at any time prior to his termination.  [Record No. 53-2, p. 25]

On March 5, 2013, one month after Taylor informed McCartt of the allegedly-biased statement, Hart and Grzanka informed McCartt of his termination, which was effective April 12, 2013.  [*Id.*, p. 22; Record No. 48-17]  The plaintiff was over sixty years-old at the time of his termination.  [Record No. 1-6, p. 3, ¶ 9]  McCartt believed that his termination was the result of age discrimination, and he claims that he informed HR of his belief.  [Record No. 1, ¶ 34]  He further reports that HR then told him that Kellogg would not consider him for rehire.  [Record No. 53, p. 26]

At the time of McCartt's separation from the company, Kellogg offered him a severance benefit package in exchange for him signing a release of any claims he might have.  [Record No. 53-2, p. 25]  He refused to sign the severance agreement, but Kellogg began sending him checks.  [*Id.*, p. 26]  Once McCartt informed Kellogg of the error, the payments stopped.  [*Id.*]

McCartt claims age-related discrimination and retaliation by Kellogg in violation of the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.*, and the Kentucky Civil Rights Act ("KCRA"), KRS Chapter 344, *et seq.*  [Record No. 1-6, pp. 3–9]

- 4 -

He also alleges that he is owed back pay and overtime under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 201, *et seq.*, and the Kentucky wage statutes, KRS § 337.010, *et seq.* [*Id.*, p. 9–11]  In addition, he seeks to pursue public policy claims premised on the alleged ADEA and FLSA violations.  [*Id.*, p. 12]

The defendants sought to exclude the allegedly-biased statement by Grzanka mentioned above, but the Court denied their motion.  [Record No. 69]  They have also moved for summary judgment on the plaintiff's claims (Counts I through VIII). [Record No. 48]

## II.

Summary judgment is appropriate when there are no genuine disputes regarding any material facts and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986); *Chao v. Hall Holding Co.*, 285 F.3d 415, 424 (6th Cir. 2002).  A dispute over a material fact is not "genuine" unless a reasonable jury could return a verdict for the nonmoving party.  That is, the determination must be "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986); *see Harrison v. Ash*, 539 F.3d 510, 516 (6th Cir. 2008).  In deciding whether to grant summary judgment, the Court views all the facts and inferences drawn from the evidence in the light most favorable to the nonmoving party.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

# III.

## A.      ADEA and KCRA Claims

Kellogg has moved for summary judgment on McCartt's ADEA and KCRA claims, arguing that he has failed to: (i) present direct evidence of age discrimination; (ii) establish a prima facie case of age discrimination based on circumstantial evidence; and (iii) establish that Kellogg's articulated reason for the termination was a pretext for discrimination. [Record No. 48-1]  Under the ADEA and the KCRA, it is unlawful for an employer "to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1); K.R.S. § 344.040(1) and (2).[1]

A plaintiff may establish a claim under the ADEA and/or KCRA by offering either direct or circumstantial evidence of discrimination. *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004).  "Direct evidence of discrimination is that 'evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's action.'"  *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003) (quoting *Jacklyn v. Schering-Plough Health Care Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999)).  If a plaintiff cannot provide direct evidence of improper motive, he may offer indirect and circumstantial evidence of such a motive under the burden-shifting approach established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973).

---

1      The Kentucky Civil Rights Act's discrimination provisions "track [ ] federal law and should be interpreted consonant with federal interpretation." *Gragg v. Somerset Technical College*, 373 F.3d 763 (6th Cir. 2004) (citing *Meyers v. Chapman Printing Co.*, 840 S.W.2d 814 (Ky. 1992)).  Accordingly, the Court will analyze these claims simultaneously.

### 1.      Direct Evidence

McCartt argues that he has presented sufficient direct evidence of age animus to defeat summary judgment.  [Record No. 53, p. 17]  In particular, he relies upon Zone Manager Kevin Grzanka's alleged statement concerning the plaintiff to District Manager John Taylor at Taylor's mid-year evaluation in summer 2012.  In Taylor's deposition, he claims that Grzanka stated, "Mr. McCartt is too old and set in his ways to make the changes necessary.  We need to, more or less, move in different directions."  [Record No. 53-13, p. 37]  This was in response to Taylor's remark that Mr. McCartt needed to be more aggressive about displays.  [*Id.*, pp. 36–37]  McCartt asserts that, because Grzanka played a role in the termination decision, his statement constitutes direct evidence of a discriminatory motive.

In general, an employer's comments referring directly to a plaintiff's age may support an inference of age discrimination.  *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020 (6th Cir. 1993).  However, the Sixth Circuit has consistently held that age-related statements are inadmissible if they "are too abstract, in addition to being irrelevant and prejudicial, to support a finding of age discrimination."  *Chappell v. GTE Prods. Corp.*, 803 F.2d 261, 268 n.2 (6th Cir. 1986) (statements regarding young people taking over in management and indicating a negative view of "old-timers" held irrelevant and unduly prejudicial); *see also McDonald v. Union Camp Corp.*, 898 F.2d 1155, 1161 (6th Cir. 1990).  Moreover, the Sixth Circuit has held that "'[s]tatements by nondecisionmakers, or statements by decisionmakers unrelated to the decisional process itself [cannot] suffice to satisfy the plaintiff's burden . . .' of demonstrating animus."  *Bush v. Dictaphone Corp.*, 161 F.3d 363, 369 (6th Cir. 1998) (quoting *Price Waterhouse v. Hopkins*, 490 U.S. 228, 277 (1989)).

- 7 -

However, the *McDonald/Chappell* rule was never intended to apply formalistically. Rather, courts "must consider as probative evidence any statements by those individuals who are in fact meaningfully involved in the decision to terminate an employee." *Wells v. New Cherokee Corp.*, 58 F.3d 233, 238 (6th Cir. 1995) (holding district court did not err in refusing to give jury instruction that only age-biased statements by primary decision-makers were probative of animus). Instead, courts assess the relevancy of a discriminatory remark by looking to: (i) the purpose and content of the statement; (ii) the identity of the speaker and his role in the adverse employment decision; and (iii) the temporal proximity between the statement and the adverse employment decision. *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 355–57 (6th Cir. 1998) (reversing summary judgment where multiple higher-level officials made discriminatory remarks).

Kellogg claims that Grzanka's statement is not direct evidence of discriminatory animus because it is isolated, ambiguous, and not temporally proximate to McCartt's termination. [Record No. 48-1, pp. 13–16]  In his response, McCartt contends that the statement constitutes sufficient direct evidence of animus because it is not isolated or ambiguous. [Record No. 53, pp. 17–22]

### a.    Purpose and Content

While Grzanka's statement is isolated,[2] it is not ambiguous.  Ambiguous statements are those that either do not suggest discriminatory animus or are not linked to the adverse

---

2      The plaintiff points to another incident where Grzanka allegedly demonstrated age-bias, attempting to show that the statement is not isolated.  [Record No. 54, p. 2]  Taylor states that during an interview of another potential employee, Grzanka asked the employee his age. [Record No. 53-13, pp. 52–53]  The interviewee did not get the position.  Because this was only

employment decision affecting the plaintiff. *Ercegovich,* 154 F.3d at 355 (the nexus between the statement and the decision need not be "direct"). For example, in *Gagne v. Northwestern Nat'l Ins. Co.*, an immediate supervisor's remark that he needed "younger blood" was not sufficient to create a material factual issue regarding whether the plaintiff's discharge was motivated by age animus because the plaintiff characterized the statement as facetious and not directed at any particular individual. 881 F.2d 309, 314, 315 (6th Cir. 1989). Similarly, a supervisor's comment that he needed a "younger person in Indiana" was ambiguous because it did not concern the plaintiff. *Kahl v. The Mueller Co.*, No. 98-1176, 173 F.3d 855, 1999 WL 196556, *2, 4 (6th Cir. 1999).

Further, a supervisor's remark that the plaintiff's birthday is "cause for concern" is ambiguous because it does not necessarily suggest animus on the part of the speaker or concern the plaintiff's employment. *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1026 (6th Cir. 1993); *see also Peters v. Lincoln Elec. Co.*, 285 F.3d 456, 477 (comment that plaintiff was "little old gray-haired man waiting to retire" was ambiguous because the plaintiff had announced his retirement and the comment did not suggest an adverse employment decision); *Scott v. Potter*, No. 05-3991, 182 F. App'x 521, 2006 WL 1524742, *5 (6th Cir. 2006) (statement "[w]hy don't you retire and make everybody happy" did not constitute direct evidence because "retire" is analogous to "quit," not necessarily suggesting "age" animus). Even a supervisor's comment that a plaintiff with Attention Deficit Disorder was "the mentally ill guy on Prozac that's going to shoot the place up" did not constitute direct

---

a question unrelated to the plaintiff that occurred over a year before the plaintiff's termination decision, it is not relevant for determining whether the statement at issue was isolated. *See Wilson v. Reliance Trading Corp. of Am.*, 208 F.3d 216, 2000 WL 282357, *1 (6th Cir. 2000).

evidence of discriminatory animus because it did not concern the adverse employment decision at issue. *Hopkins v. Elec. Data Systems Corp.*, 196 F.3d 655, 658, 661−62 (6th Cir. 1999).

On the other hand, a supervisor's suggestion that the plaintiff should retire because of her age may constitute "strong evidence of an illegitimate motive." *Danielson v. City of Lorain*, 938 F.2d 681, 684 (6th Cir. 1991) (affirming directed verdict for the employer due to strong evidence that the plaintiff performed poorly). In addition, a decision-maker's remarks that "oldtimers" with "thirty years" out to "get their ass out" strongly suggested age discrimination. *LaPointe v. United Autoworkers Local 600*, 8 F.3d 376, 380 (6th Cir. 1993) (reversing summary judgment for the employer). Further, comments that an employee is "too old to do the job" or that a "younger person could do more" are clearly direct evidence of age bias. *Wells v. New Cherokee Corp.*, 58 F.3d 233, 237 (6th Cir. 1995).

Grzanka's statement is more analogous to the cases finding direct evidence of age bias. First, the statement clearly suggests a negative view of McCartt's age, unlike *Peters*, where the speaker merely observed the fact that the plaintiff was old and that he had announced his retirement. 285 F.3d at 477. The present action is also unlike *Scott*, 2006 WL 1524742, at *5, where the speaker could have merely been suggesting that the plaintiff leave, rather than suggesting that he leave *because of* his age, as the speaker did in *Danielson*. 938 F.2d at 684. Instead, Grzanka's statement is similar to the supervisor's statement in *Wells*, where the speaker said that the employee was "too old to do the job." 58 F.3d at 237.

Second, Grzanka's statement suggests animus because it directly concerns the plaintiff and the adverse employment decision at issue. Taylor alleges that Grzanka

- 10 -

specifically mentioned "Mr. McCartt" in a discussion of the plaintiff's work skills. [Record No. 53-13, pp. 36−37] This is unlike *Gagne* and *Kahl*, where the statements at issue did not concern the plaintiff. 881 F.2d 309, 314, 315 (6th Cir. 1989); 173 F.3d 855, 1999 WL 196556, at *2, 4 (6th Cir. 1999). Grzanka's statement is also dissimilar to *Peters* and *Hopkins*, where the speaker never mentioned the possibility of an adverse employment decision. 285 F.3d at 477; 196 F.3d 655, 658, 661−62 (6th Cir. 1999). Here, however, Grzanka allegedly stated a need to "move in a different direction." [Record No. 53-13, p. 37]

While Grzanka's statement is not as blatant as that in *LaPointe*, where the decision-maker stated that the employees needed to get out, it sufficiently suggests illegitimate bias to create an issue of material fact for the jury to decide. 8 F.3d 376, 380 (6th Cir. 1993). Taylor's reaction to the remark supports this fact, as he was so "shocked" and "upset" that he informed co-workers at Kellogg of the interaction. [Record No. 53-13, p. 40] Moreover, Grzanka's statement has a closer nexus to an adverse employment decision than the statement in *Wells*, where the speaker merely noted that a "younger person could do more" after remarking on the plaintiff's being "too old." 58 F.3d at 237. Here, Grzanka allegedly stated the need to "move in a different direction," away from the plaintiff's "old and set" ways. [*Id.*, p. 38] Because Grzanka's remark suggested an impermissible motive, directly concerned the plaintiff, and related to an adverse employment decision, it is not ambiguous. Thus, this factor weighs in favor of a finding of sufficient direct evidence.

### b.      Speaker's Role

Kellogg contends that, because Grzanka did not make the ultimate decision to terminate McCartt, and because he did not know the ultimate purpose of the assessment

completed for McCartt, his statement cannot be attributed to the plaintiff's termination. [Record No. 56, p. 7]  Kellogg relies on *McDonald v. Union Camp Corp.*, which held that a "statement by an intermediate level management official is not indicative of discrimination when the ultimate decision to discharge is made by an upper level official."  898 F.2d 1155, 1161 (6th Cir. 1990).  However, *Wells* refines *McDonald*, holding that "[w]hatever the formal hierarchy" of the employer might be, the focus of the inquiry is whether the speaker "contributed significantly" to the decision.  58 F.3d at 238 (finding that speaker contributed significantly when he worked closely and consulted with the ultimate decision-maker on personnel decisions).   The *Wells* court reasoned that this rule keeps companies from "insulat[ing[ themselves from liability for discriminatory discharges."  *Id.*

Similarly, in *Sharp v. Aker Plant Servs. Grp.*, the court found that where two upper-level management officials relied entirely on the speaker's recommendation of whom to terminate, the allegedly-biased statement at issue constituted direct evidence of discriminatory animus.  726 F.3d 789, 797 (6th Cir. 2013).  *Sharp* involved a "forced ranking" system employed by the defendant for reducing labor.  *Id.* at 794.  The court reasoned that, even though the speaker was not the ultimate decision-maker, the "discriminatory information flow" began with him and "influenced the decisions made downstream."  *Id.* at 797.  While the employer contended that it conducted a "multi-step, independent review of the layoff decisions," that review was ineffective to purge the bias because it consisted "simply of comparing information submitted by [the speaker] to other information submitted by [the speaker]."  *Id.*

- 12 -

However, the speaker's involvement in the termination process does not mandate a finding that the process is tainted by discriminatory motives.  For instance, in *Rosso v. A.I. Root Co.*, a company president's remarks to an employee's supervisor regarding the employee's old age and memory loss were insufficient direct evidence of age discrimination. 97 F. App'x 517, 520 (6th Cir. 2004).  *Rosso* was a reduction-in-force case where the president, vice president, and chief operating officer jointly evaluated the plaintiff's job performance at the time when the speaker made biased statements.  *Id.* at 518−19.  Over six months later, the plaintiff's new supervisor decided to terminate Rosso because of the supervisor's independent observations of Rosso's difficulties on the product line.  *Id.* at 520. The court held that the previous supervisor's statements were not attributable to the new supervisor's evaluation.  *Id.*  Correspondingly, in *Kahl*, the court held that a supervisor's biased remarks were not direct evidence of discrimination where the annual performance evaluation was filled out by another who had heard the speaker's remarks.  173 F.3d 855, 1999 WL 196556, at *4.  The court considered the remarks to be "stray" because they were temporally and topically distant from the plaintiff's termination.  *Id.*

Grzanka "contributed significantly" to the decision to terminate the plaintiff.  *Wells*, 58 F.3d at 238.  Human Resources relied entirely on the scores Grzanka gave McCartt in deciding to terminate him.  [Record No. 48-12, ¶ 8]  The present action is similar to *Sharp*, which involved a forced ranking system for reducing labor.  726 F.3d at 794.  In both cases, the decision-makers relied completely on evaluations conducted by the speaker of the biased statement.  *Id.* at 797.  Thus, the "discriminatory information flow" began with Grzanka and influenced the decision to terminate him "downstream."  *Id.* at 797.  If Kellogg wished to

- 13 -

"insulate" itself, it should have relied on evaluations by others, or it should have ensured that objective criteria were used, rather than rely on Grzanka's word.  While this case is different from *Sharp* because the speaker in that case knew that the rankings would be used for the plaintiff's termination, the Court does not find this distinction to be legally relevant.  A reasonable supervisor would be on notice that a nationwide assessment of RSRs might -- and likely would -- lead to adverse employment decisions for those with low scores.

Moreover, this case is dissimilar to *Rosso* and *Kahl*.  97 F. App'x 517, 520 (6th Cir. 2004); 173 F.3d 855, 1999 WL 196556, at *4.  There, a supervisor other than the speaker of the biased statement independently evaluated the plaintiff.  Thus, any contribution by the speaker to the employment decision was not "significant."   But here, there was no independent assessment.  Because Grzanka played a significant role in the decision to terminate the plaintiff, this factor weighs in favor of a finding of sufficient direct evidence of discrimination.

### c.    Temporal Proximity

Lastly, biased remarks that are not proximate in time to the adverse employment action are generally not sufficiently probative.  For example, remarks over six months before the action are usually too distant.  *See Phelps*, 986 F.2d at 1025–26 (twelve months); *Kahl*, 173 F.3d 855, 1999 WL 196556, at *4 (eight months); *Ercegovich*, 154 F.3d at 357 (fourteen months); *Rosso* 97 F. App'x at *520 (six months).  However, temporal distance alone, does not require a finding of insufficient direct evidence of discrimination.  For instance, *Phelps* involved one ambiguous statement (that the plaintiff's birthday was "cause for concern") and one statement by a person who did not influence the plaintiff's termination and concerned

- 14 -

her demotion, not her termination.  986 F.2d at 1025.  Similarly, the statements in *Kahl* and *Ercegovich* did not concern the plaintiffs.  173 F.3d 855, 1999 WL 196556, at *4; 154 F.3d at 355.  And in *Rosso*, an independent evaluation of the plaintiff's performance was conducted.  97 F. App'x at 520.  While ten months between Grzanka's statement and McCartt's termination reduces the weight of the evidence, this factor does not weigh so heavily against the plaintiff for summary judgment to be proper.

Because Grzanka's allegedly-biased remark was unambiguous and asserted by someone who "contributed significantly" to McCartt's termination, the plaintiff has presented sufficient direct evidence to withstand summary judgment on his ADEA and KCRA claims.[3]  Thus, the Court will deny summary judgment on Counts I and II.

### 2.    Indirect Evidence

Kellogg contends that McCartt has waived any argument that he has presented sufficient indirect evidence of discrimination to survive summary judgment because McCartt did not even attempt in his response brief to establish a *prima facie* case of age discrimination under the *McDonnell Douglas* framework.  [Record No. 56, p. 6]  Because McCartt has established sufficient direct evidence of discrimination, the Court need not address whether he abandoned a circumstantial approach.  *See Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 348 (6th Cir. 1997) ("[T]he entire purpose of the *McDonnell Douglas* prima facie case is to compensate for the fact that direct evidence of intentional discrimination is

---

3       The defendants also argue that the plaintiff improperly relied on inadmissible evidence in supporting his ADEA and KCRA claims.  [Record No. 56, p. 3]  Because the Court has not considered this evidence in reaching its conclusion, it will not address the argument at this time.

- 15 -

hard to come by.") (citing *Price Waterhouse v. Hopkins*, 490 U.S. 228, 271 (1989) (O'Connor, J. concurring)).

**B.      Retaliation**

Kellogg next moves for summary judgment on McCartt's claims of retaliation under Title VII and KRS § 344.280.   First, Kellogg argues that McCartt has abandoned the retaliation theory premised on Kellogg's alleged failure to pay him severance benefits. [Record No. 56, p. 9]  Second, it asserts that it is entitled to summary judgment on the ADEA retaliation claim because the plaintiff has failed to exhaust his administrative remedies. [Record No. 48-1, pp. 19–20]  Third, it asserts that McCartt cannot make a *prima facie* case of retaliation under either the ADEA or KCRA.  [*Id.*, pp. 20–21]

**1.      Withholding of Severance Benefits**

A plaintiffs abandons claims that he fails to brief before the district court.  *See Conner v. Hardee's Food Systems, Inc.*, 65 F. App'x 19, 24 (6th Cir. 2003).  As a result, district courts properly decline to consider the merits of a claim where the non-movant fails to address the issue in his response to a summary judgment motion.  *Hicks v. Concorde Career College*, 449 F. App'x 484, 487 (6th Cir. 2011) (district court properly refused to consider merits of hostile work environment claim); *see also Clark v. City of Dublin, Ohio*, 178 F. App'x 522, 525 (6th Cir. 2006) (district court declined to rule on merits of Ohio age and disability claims where plaintiff only responded to defendant's arguments regarding the federal disability claim); *E.E.O.C. v. Home Depot U.S.A., Inc.*, No. 4:07CV0143, 2009 WL 395835, *18 (N.D. Ohio Feb 17, 2009) (declining to address merits of retaliation and constructive discharge claims).

- 16 -

In his Complaint, the plaintiff alleges retaliation based on Kellogg's alleged withholding of certain severance benefits.  [Record No. 1, ¶¶ 38–39]  However, when Kellogg moved for summary judgment on this issue, McCartt failed to respond.  Thus, the plaintiff abandoned this claim, and the Court will not address it on the merits.[4]

### 2.    Exhaustion - ADEA

Kellogg asserts that McCartt's retaliation claim fails under the ADEA, 29 U.S.C. § 623(d), because he did not exhaust his administrative remedies.  Specifically, Kellogg notes that he did not check the "retaliation" box on his Equal Employment Opportunity Commission ("EEOC") charge.  [Record No. 48-1, p. 20]  In his response brief, McCartt contends that the narrative attached to his charge provided the EEOC with the facts necessary to investigate his retaliation claim.  [Record No. 53, p. 25]

A person aggrieved by a discriminatory act must first exhaust his administrative remedies with the EEOC.  *Sherman v. Chrysler Corp.*, 47 F. App'x 716, 720 (6th Cir. 2002).  Under the "expected scope of investigation test," a plaintiff must allege sufficient facts in his EEOC complaint to put the EEOC on notice of other claims not specifically mentioned.  *Dixon v. Ashcroft*, 392 F.3d 212, 217 (6th Cir. 2004).  "[W]here facts related with respect to the charged claim would prompt the EEOC to investigate a different, uncharged claim, the plaintiff is not precluded from bringing suit on that claim."  *Weigel v. Baptist Hosp. of E. Tenn.*, 302 F.3d 367, 380 (6th Cir. 2002) (quoting *Davis v. Sodexho*, 157 F.3d 460, 463 (6th Cir. 1998)).

---

4      Even if the plaintiff had not abandoned this issue, summary judgment would be proper for Kellogg because Kellogg asserted a legitimate, nondiscriminatory reason for withholding McCartt's severance benefits: he never signed the agreement.  [Record Nos. 1, ¶ 38; 48, p. 22] McCartt has raised no genuine issue of material fact as to whether this reason is mere pretext.

The narrative in McCartt's EEOC Complaint does not meet the "expected scope of investigation test."  He describes Grzanka's discriminatory remark, the meeting Grzanka and Hart had with him about a rumored list, and the ability of Kellogg to transfer people to other positions so that McCartt's position would remain open.  [Record No. 48-17, pp. 6–7, "EEOC Intake Questionnaire"]  McCartt never mentions plans to apply for a different position, nor does he state that Anderson told him that he would not be accepted for any other positions.  His narrative simply does not put the EEOC on notice of a retaliation claim.  While McCartt cites the often-quoted phrase "retaliation naturally grows out of the underlying substantive discrimination charge," the Sixth Circuit cases quoting that phrase include narratives that actually provide the EEOC with the facts related to the uncharged claim.  *Weigel*, 302 F.3d at 380.  [Record No. 53, p. 23]

For example, *Duggins v. Steak "n Shake, Inc.* stated the quote in dictum after finding that the plaintiff's attached affidavit "clearly raised allegations of retaliation" because it mentioned the plaintiff getting passed over for promotions and being singled out for reprimands because she complained about her daughter's rape and her own sexual harassment.  195 F.3d 828, 832–33 (6th Cir. 1999).  Similarly, in *Dixon*, the Sixth Circuit reversed the district court's dismissal of the retaliation claim because the narrative included facts about the supervisor's response to complaints about harassment.  392 F.3d at 217.  And in *Weigel*, the court found that a plaintiff's EEOC charge met the scope of investigation test where it included facts relating to the employer's refusal to rehire the plaintiff.  302 F.3d at 380.

- 18 -

On the other hand, in *Abeita v. TransAmerica Mailings, Inc.*, the Sixth Circuit held that the district court properly dismissed the plaintiff's retaliation claim in a sex discrimination case because she neither checked the "retaliation" box nor described anything indicating that she might have a retaliation claim in her EEOC complaint. 159 F.3d 246, 254 (6th Cir. 1998). Further, in *Davis*, the court warned against the charge filing requirement being "written out of the law" where the EEOC charge has insufficient facts to notify the EEOC of a particular claim. 157 F.3d at 464.

Here, the plaintiff's EEOC charge is more similar to those in *Abeita* and *Davis*. 159 F.3d at 254; 157 F.3d at 464. McCartt simply does not mention reporting Grzanka's statement to his superiors. Thus, the EEOC was not aware that he had engaged in a protected activity that could have resulted in his termination. In addition, he failed to mention his alleged conversation with Anderson about future employment with Kellogg. Nor did he include any facts about Kellogg denying its terminated employees the opportunity to re-apply. Because McCartt failed to include sufficient facts in his EEOC complaint, he does not meet the ADEA's "scope of investigation" test for either of the remaining retaliation theories. As a result, summary judgment is proper for Kellogg on Count III of the plaintiff's Complaint.

### 2.    Merits - KCRA

McCartt contends that his remaining retaliation claims under KRS § 344.280 withstand summary judgment because there is no administrative exhaustion requirement in the KCRA. [Record No. 53, p. 26] However, Kellogg claims that McCartt fails to make a *prima facie* case of retaliation under the statute. [Record No. 48, pp. 22–24] Kentucky

- 19 -

courts interpret retaliation under the KCRA consistent with its interpretation under federal law. *Brooks v. Lexington-Fayette Urban Cty. Housing Auth.*, 132 S.W. 790, 801 (Ky. 2004). Thus, a plaintiff claiming retaliation bears the initial burden of proving a prima facie case, which includes proof that: (i) the plaintiff engaged in a protected activity; (ii) his exercise of such activity was known by the defendant; (iii) the defendant took an action that was materially adverse to the plaintiff; and (iv) there is a causal connection between the protected activity and the materially adverse action. *Id*. at 803; *Laster v. City of Kalamazoo*, 746 F.3d 714, 730 (6th Cir. 2014).

"It is well-established that, in order to satisfy the adverse action requirement, the Plaintiff must show that as a result of her engaging in protected activity, she suffered a 'materially adverse' change in the terms or conditions of employment. *Brower v. Ross Prod. Div.*, No. 2:01-CV-471, 2002 WL 484702, *3 (S.D. Ohio. Feb. 25, 2002). Generally, the adverse action prong requires that the plaintiff actually apply for available positions. *Id*. (dismissing plaintiff's retaliation claim premised on the theory that the defendant failed to allow the plaintiff to apply for re-employment); *see also Vaughn v. Louisville Water Co.*, 302 F. App'x 337, 348 (6th Cir. 2008) ("Not receiving a promotion for which one did not apply would not dissuade a reasonable worker from engaging in protected conduct, and accordingly does not constitute a materially adverse action.").

The formal application requirement may be relaxed where the job-seeker makes a "reasonable attempt to demonstrate to the employer that he is interested in the job." *Grant v. Harcourt Brace College Publishers*, No. 98-3829, 191 F.3d 452, 1999 WL 717982, *4 (6th Cir. Sept. 9, 1999) (affirming district court's grant of summary judgment to employer on

- 20 -

plaintiff's retaliation claim premised on defendant's refusal to consider plaintiff for rehire). Or the plaintiff may escape the requirement with a showing that the application process would have been futile. *Id*. at *3. For this exception, the plaintiff must show "overwhelming evidence of pervasive discrimination in all aspects" of the employer's internal employment practices. *Bacon v. Honda of Am. Mfg., Inc.*, 370 F.3d 565, 576 (6th Cir. 2004).

Here, McCartt alleges two theories of retaliation under the KCRA: (1) Kellogg terminated him for reporting Grzanka's biased statement to his superiors; and (2) Kellogg refused to consider him for rehire because he informed Anderson that he was terminated for discriminatory reasons. [Record No. 53, p. 26] McCartt's first theory fails because McCartt now states that he never reported Grzanka's statement to his superiors prior to his termination. [Record No. 53-2, p. 25] As a result, he did not engage in a protected activity prior to that termination.

McCartt's second theory of retaliation fails because he has not demonstrated that Kellogg took adverse action against him.[5] The plaintiff claims that Anderson's alleged statement that he would not be considered for future positions fulfills this prong. [Record No. 53, p. 26] But a plaintiff alleging that his failure to be rehired is retaliatory must demonstrate that he actually applied for the position or that his circumstances fit within an exception. McCartt has not argued that he made a "reasonable attempt to demonstrate" to Kellogg that he was interested in a particular position, as required by *Grant*, 191 F.3d at *4.

---

[5]    To the extent that McCartt now claims that Kellogg's failure to rehire him after his recent 2015 application constitutes retaliation, the Court notes that this application arose after the filing of the plaintiff's Complaint. [Record No. 53-2, p. 24] Because this claim was not pled in the Complaint, the Court need not address it.

Further, he has not pointed to "overwhelming evidence of pervasive discrimination in all aspects" of Kellogg's internal employment practices to show that formal application would have been futile. *Bacon*, 370 F.3d at 576.  McCartt merely noted that HR keeps track of applicants who formerly worked at Kellogg; however, that is not overwhelming evidence of a discriminatory policy.  [Record No. 48-5, p. 44]  Because McCartt has failed to make a *prima facie* case of retaliation under the KCRA, summary judgment is proper for the defendant regarding Count IV.

### C.      FLSA and Kentucky Wage Statutes

Kellogg has moved for summary judgment on Counts V, VI, and VIII of the plaintiff's Complaint, which allege that Kellogg violated 29 U.S.C. § 207 and KRS § 337.285 by failing to pay McCartt overtime, and that it violated KRS § 337.355 by failing to compensate him for meal/rest breaks.  [Record No. 1, ¶¶ 48−76, 85−88]  Because McCartt failed to address the "breaks" issue in his response to Kellogg's motion for summary judgment, the Court concludes that he has abandoned this claim.  Thus, the Court will not consider it on the merits and will grant summary judgment to Kellogg on Count VIII.[6]  For Counts V and VI, Kellogg argues that the plaintiff's RSR position is an exempt "outside salesman" position under both the FLSA and the Kentucky wage statutes.  [Record No. 48-1, pp. 24−28]  In his response, McCartt contends that the "outside salesman" exception does not apply to him.  [Record No. 53, pp. 10−17]

---

6      Further, McCartt has not presented sufficient evidence of the date and time of Kellogg's alleged violations.  [*See* Record No. 53-2, p. 28.]  *Hisle v. CorrectCare-Integrated Health, Inc.*, No. 2013-CA-000937-MR, 2015 WL 3638006 (Ky. Ct. App. June 12, 2015) (finding that appellants' claims that they missed lunch practically every day were insufficient) (citing *Myracle v. Gen. Elec. Co.*, No. 92-6716, 33 F.3d 55, 1994 WL 456769 (6th Cir. Aug. 23, 1994)).

The Fair Labor Standards Act requires that employers pay their employees overtime for a workweek longer than forty hours.  29 U.S.C. § 207(a).  However, employees in the capacity of outside salesman are exempted.  29 U.S.C. § 213(a)(1).  The court must construe this exemption narrowly and against the employer.  *Christopher v. SmithKline Beecham Corp.*, 132 S. Ct. 2156, 2161 (2012).  KRS § 337.385(1) also requires employers to pay overtime to employees, and the "outside salesman" exemption exists under KRS § 337.010(2)(a)(2).  The overtime provisions of the FLSA and Kentucky wage and hour law are co-extensive and analyzed identically.  *City of Louisville, Div. of Fire v. Fire Serv. Managers Ass'n*, 212 S.W.3d 89, 92 (Ky. 2006).

Under the Department of Labor regulations, an outside salesman is one whose primary duty is either making sales or obtaining orders or contracts for services and who is "customarily and regularly engaged away from the employer's place of business in performing such primary duty."  29 C.F.R. § 541.500.  Factors for determining an employee's "primary duty" include: (i) the relative importance of the exempt duties as compared with other types of duties; (ii) the amount of time spent performing exempt work; (iii) the employee's relative freedom from direct supervision; and (iv) the relationship between the employee's salary and the wages paid to other employees for the kind of nonexempt work performed by the employee.  29 C.F.R. § 541.700(a).

The Sixth Circuit has addressed the "outside salesman" exemption.  In *Killion v. KeHE Distrib., LLC*, it held that the district court improperly granted summary judgment to the defendant where the plaintiffs were sales representatives for the defendant-distributor of ethnic and health foods.  761 F.3d 574 (6th Cir. 2014).  The plaintiffs' duties included

- 23 -

stocking shelves, reordering merchandise when inventory was depleted, and occasionally cold-calling smaller independent retailers to solicit orders. *Id.* at 577. Customer development established the initial relationships with chain stores, and the business and development team and account management team negotiated the deals to get the defendant's products into the stores. *Id.* at 578. In addition, the plaintiffs' compensation was primarily based on stocking shelves—it did not vary with incremental sales. *Id.* at 585.

The court held that a jury could conclude that making sales was not the primary responsibility of the plaintiffs because: (1) the majority of their time was spent stocking shelves; (2) their compensation was based primarily on that stocking; and (3) a question remained as to whether the "promotional" activities were in furtherance of the plaintiffs' own sales or the sales by account managers. *Id.* For the latter factor, the court looked to 29 C.F.R. § 541.503, which provides, "[P]romotional work that is incidental to sales made, or to be made, by someone else is not exempt outside sales work." This regulation also provides an example of a "company representative who visits chain stores, replenishes stock by replacing old with new merchandise, sets up displays and consults with the store manager when inventory runs low, but does not obtain a commitment for additional purchases." 29 C.F.R. § 541.503(c).

The Tenth Circuit has held that plaintiffs' promotional and merchandising activities were "incidental to and in conjunction with" their own sales where there was no question that the plaintiffs' primary responsibility was to sell Coca-Cola products to grocery stores, while the merchandisers performed distribution and promotion duties. *Ackerman v. Coca-Cola Enterprises, Inc.*, 179 F.3d 1260, 1261 (10th Cir. 1999). Similarly, in *Meza v. Intelligent*

*Mexican Marketing, Inc.*, the Fifth Circuit found that the plaintiff's work was incidental to his sales because only those in his position were responsible for "any aspect" of sales to the employer's customers.   720 F.3d 577, 587 (5th Cir. 2013).   Specifically, the *Meza* court reasoned that the case was unlike *Skipper v. Superior Dairies, Inc.*, where "negotiation between management officials of [the employer] and officials of [the store]" determined the product in each individual store.   *Id*. at 586 (referring to *Skipper v. Superior Dairies, Inc*., 512 F.2d 409 (5th Cir.1975)).

The question for this Court is not whether McCartt's primary duty was making sales. Instead, the question is whether McCartt raised a genuine issue of material fact regarding whether his primary duty as Kellogg's RSR in District 797 was making sales.   After analyzing the factors in the regulations, the Court concludes that he did not.   Only one of the four factors weighs in his favor.

### 1.     Relative Importance of Exempt Duties to Non-exempt Duties

Kellogg has presented evidence that the RSRs' duty to make sales was of utmost importance.   For example, the Job Profile for RSRs lists as the "Primary Function" that the RSR is the customer-facing, in-store, sales employee" requiring "effective fact-based selling techniques" and that the customer "achieve targeted sales and volume goals."   [Record No. 48-6, p. 2]   McCartt agrees that this job description is accurate.   [Record No. 53-2, p. 10] Further, RSR's performance was measured by "Dollar Growth" and sales, and variable labor depended on sales.   [Record No. 48-10]   In addition, McCartt's "2012 Performance Development Plan" focused on his responsibility to drive growth, expand relationships with national account teams, and use variable labor.   [Record No. 48-11]   In fact, in attempting to

demonstrate to the EEOC that he was qualified for the RSR position, McCartt focused primarily on the fact that his sales records were better than his co-workers'. [Record No. 48-17, p. 6; Record No. 48-20] He again affirmed his qualifications based on his sales figures in his deposition. [Record No. 53-2, p. 25]

McCartt attempts to counter Kellogg's evidence (and his own concessions) by focusing on the fact that he only made "incremental" sales because account executives organized the deals with his large retail chain customers. [Record No. 53-2, p. 27] However, he concedes that the RSR responsibility was to focus upon selling more product within the stores, which was communicated to him at group district meetings once per month. [*Id.*, p. 19] Further, his former District Manager John Taylor stated that "the expectation of the RSR or territory manager was to sell [product] incrementally to help increase the display penetration and increase sales." [Record No. 53-13, pp. 17, 19] He also mentioned that the RSR position was changing so that RSRs were supposed to place "more focus" on incremental sales. [*Id.*, p. 29] While Taylor confirmed the fact that RSRs would not be able to place their focus on sales when they did not have sufficient merchandisers assigned to them, he also could not recall a time when McCartt asked for more merchandisers. [Record No. 53-13, p. 71] This suggests that McCartt may not have been placing his focus where Kellogg expected it.

While this factor does not weigh heavily in Kellogg's favor, it does lean in that direction. This case differs from *Killion*, where the employees could only make sales with the independent stores—there was no expectation that they would make sales with the large retail chains. 761 F.3d at 578. It is not as strong as *Mesa* or *Ackerman*, but it strongly

- 26 -

demonstrates that RSRs were to focus on sales, leaving the merchandising to the merchandisers.  179 F.3d at 1261; 720 F.3d at 587.

### 2.      Time Spent Performing Non-exempt Work

McCartt argues that, because he spent the majority of his time "merchandising," his position does not qualify for the RSR exemption.  [Record No. 53-2, p. 16]  Some of this merchandising was in furtherance of deals already-made by account executives at Kellogg, while some was for McCartt's sales.  McCartt and Taylor sufficiently demonstrate that more of McCartt's time may have been spent on promotional activities that were not incidental to his own sales, thus categorizing those activities as non-exempt work.  [*See* Record No. 53-2, p. 8.]  While this factor weighs in the plaintiff's favor, it is discounted by the fact that he may not have been using his time in the way Kellogg expected.  He claims that this was because there were insufficient merchandisers, but Taylor could not recall an instance when McCartt asked for more.  [*Id.*, Record No. 53-13, p. 71]  McCartt cannot claim the benefit of this factor if his own non-compliance resulted in the factor favoring his position.

### 3.      Freedom from Direct Supervision

The plaintiff presents little evidence of direct supervision.  For example, District Managers would perform annual "Performance Development Plans" and provide the RSRs with monthly scorecards.  [Record Nos. 48-10, 48-11]  However, each RSR was responsible for managing the contacts with the stores in his district.  [Record No. 53-2, p. 6]  In describing McCartt's work, McCartt's direct supervisor commented that he could count on the plaintiff to "service the stores."  [Record No. 53-13, p. 13]  He did not focus on specifics, but rather remarked that "day in and day out," he could count on McCartt to show up for

work and do "what was necessary." [*Id.*, p. 14]  Because McCartt has presented little evidence of direct supervision, this factor weighs in Kellogg's favor.

### 4.    Compensation

This factor clearly weighs in Kellogg's favor because McCartt's commissions were based entirely on the sales he made.  [Record No. 53-2, p. 27]  The Sixth Circuit viewed this factor as particularly important in *Killion*, where the plaintiffs' commissions were based on their stocking of shelves.  761 F.3d at 585.  This case differs from *Killion* in two important respects: McCartt had the ability to make incremental sales, unlike the plaintiffs in *Killion*, and his bonuses were computed on his sales, while those in *Killion* were based on shelf stocking.

Because three of the four factors in the regulations weigh in Kellogg's favor, and because even the one factor in McCartt's favor is discounted by his non-compliance with Kellogg's expectations, the Court will grant summary judgment to Kellogg on the plaintiff's overtime claims in Counts V and VI.

### D.    Wrongful Discharge in Violation of Public Policy

Kellogg has also moved for summary judgment on the wrongful discharge claim (Count VII), asserting that it is preempted by the ADEA and KCRA because any remedies the plaintiff seeks are "established in the statutes underpinning" the claims.  [Record No. 48-1, p. 31]  Further, Kellogg asserts that McCartt has waived this claim because he has failed to address it in his response brief.   [Record No. 56, p. 5]   Because the plaintiff has not addressed the public policy claim, he has abandoned it.  *Hicks v. Concorde Career College*, 449 F. App'x 484, 487 (6th Cir. 2011).

- 28 -

But even if McCartt had addressed the public policy claim, the Court would still grant summary judgment to the defendant.  The Kentucky Supreme Court has established the following limitations to the wrongful discharge exception to the at-will employment doctrine:

> (1) The discharge must be contrary to a fundamental and well-defined public policy as evidenced by existing law.  (2) That policy must be evidenced by a constitutional or statutory provision.  (3) The decision of whether the public policy asserted meets these criteria is a question of law for the court to decide, not a question of fact.

*Grzyb v. Evans*, 700 S.W.2d 399, 401 (Ky. 1985).  Both the ADEA and the KCRA make it unlawful for an employer to discharge an employee because of an individual's age.  29 U.S.C. § 621; K.R.S. § 344.040.  These statutes also provide the remedy available to the aggrieved party.  In *Grzyb*, the Kentucky Supreme Court found that K.R.S. § 344.040 would provide "the necessary underpinning" for a wrongful discharge suit based on sex discrimination, concluding that "[t]he statute not only creates the public policy but preempts the field of its application."  *Grzyb*, 700 S.W.2d at 401.

Further, in *Banister v. Commonwealth of Kentucky*, No. 5:04cv78R, 2005 WL 1214252 (W.D. Ky. May 20, 2005), presuming that the plaintiff's wrongful discharge claim was based on facts similar to the plaintiff's claim of reverse race discrimination and age discrimination, the court concluded that because K.R.S. § 344.040 "both declares the unlawful act and specifies the civil remedy," the plaintiff was limited to a statutory remedy. *Id*. at *8 (quoting *Grzyb*, 700 S.W.2d at 401).

In the present case, because McCartt's wrongful discharge claim is premised on the same facts as the ADEA, KCRA, FLSA, and Kentucky wage statute claims, he is limited to a

statutory remedy.   Therefore, his wrongful discharge claim cannot survive summary judgment.  *See Jones v. Kroger*, Inc., No. CivA.504-543-JMH, 2005 WL 2807194 (E.D. Ky. Oct. 27, 2005).

## IV.

Based on the foregoing, the Court will grant summary judgment on Counts III through VIII but deny summary judgment on Counts I and II.  McCartt has presented sufficient direct evidence of age discrimination to withstand summary judgment on his ADEA and KCRA claims.  However, he has failed to present sufficient circumstantial evidence to make a *prima facie* case of retaliation under the KCRS because he did not apply for a particular position for rehire nor point to overwhelming evidence that formal application would be futile.  He also failed to exhaust his administrative remedies with respect to the ADEA retaliation claim.

McCartt has abandoned several claims, including: (i) retaliation, premised on Kellogg's alleged failure to pay him severance benefits; (ii) the Kentucky wage/hour violation, premised on Kellogg's failure to pay him for "breaks;" and (iii) the public policy claim based on alleged violations of the ADEA, KCRA, and FLSA.  The plaintiff also has failed to demonstrate that a genuine issue of material fact exists regarding whether he is an outside salesman under the FLSA and the Kentucky wage statute.

Accordingly, it is hereby **ORDERED** as follows:

1. The defendants' motion for summary judgment [Record No. 48] is **GRANTED**, with respect to Plaintiff McCartt's claims of retaliation, violation of the FLSA

and the Kentucky wage/hour statute, and violation of Kentucky public policy (Counts III through VIII).

2.      The defendants' motion for summary judgment [Record No. 48] is **DENIED** with respect to the remaining claims (Counts I and II).

This 14th day of October, 2015.

Signed By:

_Danny C. Reeves_   DCR

**United States District Judge**